**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| AMIR MOHAMMADI, | ) | Civil Action No. 2:22-cv-1684 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| WILLIAM BEHRE and DANIEL | ) | FILED ELECTRONICALLY |
| GREENSTEIN, | ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

## COMPLAINT IN CIVIL ACTION

AND NOW comes Amir Mohammadi ("Plaintiff" or "Dr. Mohammadi"), by and through undersigned counsel, and files this Complaint in Civil Action stating as follows:

### I. PARTIES

1.     Dr. Mohammadi is an adult individual currently residing in Butler County, Pennsylvania.

2.     Defendant William Behre ("Dr. Behre" or "President Behre") is currently the President of Slippery Rock University of Pennsylvania ("SRU") and has his primary place of business at 1 Morrow Way, Slippery Rock, PA 16057.

3.     Defendant Daniel Greenstein ("Chancellor Greenstein") is currently the Chancellor of the Pennsylvania State System of Higher Education ("PASSHE") and has his place of business at 2300 Vartan Way, Suite 207, Harrisburg, PA 17110.

### II. JURISDICTION

4.     The jurisdiction of this Court over the matters set forth in this Complaint is founded upon 28 U.S.C. § 1331 and 28 U.S.C. § 1367(a).

### III.  VENUE

5.      The events related in this Complaint occurred in Butler County, Pennsylvania, in the Western District of Pennsylvania; therefore, venue is appropriate in this Court.

### IV.  ADMINISTRATIVE EXHAUSTION

6.      Dr. Mohammadi filed an administrative charge with the U.S. Equal Employment Opportunity Commission on or about August 21, 2022; this was docketed at 533-2022–02373.

7.      The aforementioned charge was cross-filed with the Pennsylvania Human Relations Commission.

8.      The aforementioned charge set forth claims for discrimination on the basis of race, national origin, religion, retaliation, age, and hostile work environment.

9.      As soon as the aforementioned charge is administratively exhausted Dr. Mohmammadi will move for leave to file an amended complaint raising claims for race/national origin, religion, and age discrimination.

10.      Dr. Mohammadi will also seek leave to add SRU, the Council of Trustees, and/or the PASSHE Board of Governors as additional defendants.

### V.  FACTS

11.      Dr. Mohammadi is a distinguished post-secondary educational administrator with over thirty years of experience in diverse settings, domestically and abroad, including serving the Delaware State University, President of the Housing Foundation Board of Directors, Controller of the Development Foundation, and Treasurer of the Board of Trustees of Delaware State University.

12.       Dr. Mohammadi's work was recognized by the President of the National Association of Colleges and Universities ("NACUBO"), which represents 1500 colleges and universities across

the United States.

13.     Initially, he was invited to become a member of the advisory panel, and then progressed to become the Chairman for Sustainability advising NACUBO.

14.     Dr. Mohammadi was recognized and honored by the Delaware State Senate for modernizing laws, rules, and regulations, and accounting principles, and for creating the first "on balance-sheet, off debt capacity," bond financing, which was the first known in United States higher education, on energy savings; this resulted in the U.S. Secretary of Energy inviting Dr. Mohammadi to the White House twice.

15.     A naturalized U.S. citizen, Dr. Mohammadi was born in Iran on September 20, 1959, and is a Muslim.

16.     Through a competitive search process Dr. Mohammadi joined SRU as Vice President for Finance and Administrative Affairs in May 2014.

17.     In March 2015 Dr. Mohammadi was promoted and named Vice President for Finance and Administrative Affairs and Advancement Services at SRU.

18.     On December 2017, Dr. Mohammadi was promoted to interim Vice President for Advancement in addition to then current responsibilities.

19.     In 2018, Dr. Mohammadi's candidacy for the SRU Presidency was derailed because of his race, religion, and national origin.

20.      On or about April 6, 2018, Dr. Mohammadi filed a discrimination complaint with the EEOC and Pennsylvania Human Relations Commission raising issues of including race, retaliation, religion, and national origin discrimination (attached hereto as "Exhibit A").

21.     On or about December 27, 2018, Dr. Mohammadi filed a Complaint in Federal Court

embracing these charges (attached hereto as "Exhibit B").

22.     SRU is a constituent institution of PASSHE.

23.     Dr. Behre has been the President of SRU since July 1, 2018.

24.     On or about July 1, 2019, Dr. Mohammadi and SRU and PASSHE executed a Settlement Agreement and Release of all claims (attached hereto as "Exhibit C").

25.     The settlement terms included

     a.     a four year scholarship for a student in Dr. Mohammadi's name;

     b.     an executive leadership course;

     c.     that Dr. Mohammadi would be considered by the Chancellor for placement on the Chancellor's short list for any interim placement that arises; and

     d.     that Dr. Mohammadi would be permitted to provide input and advice to the Council of Trustees, the Board of Governors, and the Chancellor.

26.     Based on Dr. Mohammadi's experience, knowledge, and record of accomplishments, six months prior to the aforementioned settlement the new Chancellor asked Dr. Mohammadi to help him with PASSHE's troubled financial situation and offered him the position of Senior Advisor to the Chancellor.

27.      SRU and PASSHE have retaliated against Dr. Mohammadi including by:

     a.     Not funding his scholarship; and

     b.     Not placing Dr. Mohammadi's name on the short list of any interim presidency that did arise.

28.     In fact, four interim presidencies have arisen and Dr. Mohammadi was not placed in any of these positions.

29.     Prior to settlement, Dr. Mohammadi, based on his experience, knowledge, and proven record, was promoted by the new Chancellor yet again and served as "loaned executive" in the office of the Chancellor for an initial term of six months; this term was extended for three additional months, hence Dr. Mohammadi served as a loaned executive for nine months.

30.     In 2019 Dr. Mohammadi was named SRU's Senior Vice President for Administration, Global Engagement, Economic Development and Chief Innovation Officer; he also maintained his title of Interim Vice President for Advancement; this appointment demonstrated Dr. Behre's appreciation of Dr. Mohammadi's abilities across senior administrative disciplines.

31.     In 2019 SRU started to develop programs in engineering; however, construction on the necessary temporary engineering facilities did not commence until Spring 2021, which was too late for the three temporary laboratories needed for students matriculating in the Fall 2021 semester.

32.     These laboratories did not open until late in the Fall semester, in fact on October 15, 2021, which means the students missed the first seven weeks of the semester.

33.     On the morning of December 21, 2020, Dr. Mohammadi raised an alarm regarding the decision to build temporary Engineering Labs, which were quite late due to Dr. Behre's vacillation and inability to commit to the project, despite the concerns of Dr. Mohammadi and those of the Assistant Vice President for Facilities Planning Scott Albert.

34.     Dr. Mohammadi also asked why he and the assistant Vice President for Facilities Planning were not contacted to meet with the engineering consultant.

35.     As a result, these temporary laboratories were thus likely further delayed from being ready for the first day of classes for Fall 2021, which was going to be a serious issue for junior engineering students unable to obtain a proper education and training for the field.

36.     Dr. Behre indicated that he would speak to Abbey Zink ("Dr. Zink"), then the University Provost, and would get back to Dr. Mohammadi the same day.

37.     Dr. Behre wrote back that afternoon that the consultant was not able to attend; however, that individual had a three-day meeting on Zoom that focused only on the curriculum.

38.     Dr. Behre indicated that the next time the engineering consultant came to campus, he (Dr. Behre) would make sure that the Assistant Vice President for Facilities Planning and Dr. Mohammadi would have the opportunity to meet with him.

39.     Later, Dr. Mohammadi learned that Dr. Behre's statement about review of the curriculum was not true.

40.     When engaging the consultant visited over Zoom and in person two additional times, neither the Assistant Vice President for Facilities Planning nor Dr. Mohammadi ever were contacted, and thus did not participate.

41.     In February 2022, Dr. Mohammadi wrote to the Office of the PASSHE Chancellor and the Council of Trustees raising concerns regarding the financial health of SRU and the obfuscation of the true health of the budget and other misleading information as was evident in the CPP (Comprehensive Planning Process).

42.     Specifically, Dr. Mohammadi questioned the reliability of the financial data produced by SRU's two Chief Financial Officers, Molly Mercer ("Ms. Mercer") and Carrie Birkbichler ("Ms. Birkbichler"), both significantly younger and less well qualified individuals who had replaced him although neither was offered the job when both were competing against Dr. Mohammadi who was chosen.

43.     Dr. Mohammadi further pointed out that SRU lacked any long term academic plan,

engineering plan, strategic plan, and master plan in the face of mounting budget deficits and that, unlike some other PASSHE institutions, SRU's financial condition was declining.

44.     Dr. Mohammadi indicated his refusal to sign off on the financial projections for the new engineering program because he believed that they were not true and misleading, and further that the reality was that SRU could not afford such a program.

45.     On July 2, 2018, Dr. Mohammadi stated to Dr. Behre, based on new program requirements, that he (Dr. Mohammadi) refused as CFO to sign off on engineering financial projections since they were not accurate and lacked financial integrity.

46.     Dr. Behre informed Dr. Mohammadi that he (Dr. Behre) was aware of Dr. Mohammadi's objections and refusal to sign off on them; despite Dr. Mohammadi's objections, Dr. Behre indicated that he would instead sign off and forward the material to PASSHE for Board of Governors approval.

47.     Dr. Mohammadi communicated to Dr. Behre that his signing off was is in violation of PASSHE rules, and that it was Dr. Mohammadi's responsibility as the CFO to maintain financial integrity.

48.     Dr. Behre ignored Dr. Mohammadi's prudential concerns and therefore neither the Council of Trustees nor PASSHE and its Board of Governors ever were notified about the data's inaccuracies and lack of integrity, which caused them to be misled and to approve the mechanical and civil engineering programs.

49.     According to the October 2018 budget projections and analysis, the mechanical and civil engineering programs were supposed to produce net revenues of approximately $2 million and $1.4 million, respectively, within five years.

50.     The aforementioned projections have never been achieved and Dr. Mohammadi was correct in his refusal to sign off on these new programs.

51.     In a letter dated October 15, 2019, Dr. Behre recognized Dr. Mohammadi's role in securing the financial stability of SRU:

> When I arrived, I inherited an institution that was in an extraordinarily sound financial position.  This strength is in large part because of the skillful stewarding of the university's resources that you [Dr. Mohammadi] have overseen.  You are an accomplished financial planner as well as an expert contract negotiator.  Your diligent work in these areas will serve the university well for years to come.

52.     Ms. Mercer's financial analysis of October 2018 obscured the cost of facilities and overhead and also admitted, "..if we just put on significant extra costs, I believe our analysis would be challenged by those reviewing it and we would be directed back to this work."

53.     Dr. Behre ordered Dr. Mohammadi to overlook Ms. Mercer's deficient financial judgment.

54.     After Ms. Mercer was promoted from Associate Vice President for Finance reporting to Dr. Mohammadi into a new role as Chief Financial Officer including a significant raise, she reversed her position from reservation to full endorsement; only Dr. Mohammadi maintained consistent opposition to this deception.

55.     Dr. Behre created an environment of antagonism among the members of the SRU administration.

56.     Consequently, Dr. Zink told  Dr. Mohammadi that in Dr. Behre's estimation Dr. Mohammadi was "persona non grata" on the SRU campus.

57.     Another new Vice President praised Dr. Mohammadi's expertise in response to Dr. Behre's unfounded criticism that Dr. Mohammadi was not focused and not paying attention.

58.     The attacks against Dr. Mohammadi's expertise started with Dr. Behre's reassigning all of Dr. Mohammadi's financial oversight responsibilities to a less-well qualified person who reported to Dr. Mohammadi, and who years ago was not hired when Dr. Mohammadi instead was hired to be her supervisor.

59.     To effectuate this scheme, Dr. Behre told Dr. Mohammadi's Associate Vice President that this responsibility shift would relieve Dr. Mohammadi of excess duties rather than undermine Dr. Mohammadi's authority as she initially and correctly believed.

60.     Dr. Behre gave the Associate Vice President a 15% raise when the rules only allowed a 10% raise for such a promotion, as was given to all the other cabinet members except Dr. Mohammadi, who received a 7.5% raise.

61.     Shortly thereafter, Dr. Behre proposed a sharp student tuition increase, to which only two members of the academic cabinet disagreed (Dr. Mohammadi and the acting Provost/Vice President for Academic Affairs).

62.     Only a few months later Dr. Behre had to rescind the tuition increase and reverse himself blaming it on the COVID-19 pandemic.

63.     On numerous occasions Dr. Behre openly criticized PASSHE, the Board of Governors, and Chancellor Greenstein which contributed to a hostile work atmosphere at SRU that caused Dr. Mohammadi to complain about this unprofessional behavior.

64.     During Dr. Mohammadi's promotion and service as Senior Advisor to the Chancellor, Dr. Behre, on numerous occasions, created a conflict of interest hence a hostile workplace due to his constant negative comments regarding the Chancellor's ideas for addressing the serious financial problems of PASSHE.

65.     As a result of Dr. Mohammadi's dual reporting to President Behre and Chancellor Greenstein, he participated in text messaging and conversations defending the principles of financial responsibility within PASSHE that increasingly became absent during Dr. Mohammadi's role as responsible financial advisor to the Chancellor.

66.     Dr. Behre expanded the cabinet under the guise of seeking greater input, but the interim Provost, the Chief of Human Resources, the new Provost, the new Vice President for Advancement, and Dr. Mohammadi were not consulted on major issues and the official minutes never reflected their objections such as to increasing tuition, the Comprehensive Planning Process (CPP) and finalization of Academic Plans including Engineering and Strategic Plans, which inform the Master Planning process, and which has remained unfinished since 2007.

67.     This deficiency contradicts the normal 7-year life of such plans at PASSHE schools. SRU is now lacking 15 years of such documentation even though it is required and constantly requested by PASSHE in order that resources are not wasted.

68.     Important documents such as the current Comprehensive Planning Process (CPP) were created under the new Chancellor so that the Trustees and Board of Governors would know what is occurring on campuses regarding strategic financial directions with transparency and input from all campus stakeholders; instead, President Behre and CFO Ms. Mercer developed this new critical document on their own in a vacuum and allowed only 20 minutes for input without even sharing the document.

69.     That Dr. Mohammadi complained and Chief Human Resource Officer Lynn Motyl voiced her opinion that a copy should be shared for a thorough review, but CFO Ms. Mercer responded that these "numbers were very fluid," apparently wary of Dr. Mohammadi's possible

criticism given his extensive knowledge of PASSHE's financial situation  and prevailing lack of transparency.

70.     This effort by Dr. Behre and Ms. Mercer precluded involvement of the most experienced senior leaders in the cabinet.

71.     Dr. Mohammadi complained at the time to the interim Provost, Chief of Human Resources and Vice President for Advancement, and they also acknowledged that they were not consulted except during 20 minutes; out of many pages of numbers, only one number was changed.

72.     Later when the report was filed with PASSHE, Dr. Mohammadi understood the scheme of obfuscation and misleading on engineering and other important strategic financial planning issues; it should be noted that CPP on PASSHE campuses are developed primarily by Chief Academic Officers but at SRU neither the Interim Provost was involved with the first CPP nor was the new Provost involved with the second CPP.

73.     Ms. Birkbichler admitted to Dr. Mohammadi in July 2018 that she exaggerated the enrollment and thereby increased the revenue artificially for Civil and Mechanical Engineering in order to cause the Council of Trustees (COT) and Board of Governors (BOG) to approve the program; Dr. Mohammadi informed Dr. Behre, but instead of opening an investigation, Dr. Behre promoted her to the cabinet and subsequently further promoted her to CFO.

74.     When Dr. Mohammadi questioned President Behre's decision, the President said that no further falsehoods by Ms. Birckbichler would be permitted.

75.     Later, Ms. Birckbichler in her CFO role regarding purchasing and contracts covered up the Service Purchase Contract with the University Foundation for hiring BCW, the private public

relations firm that Dr. Behre used to work for by-passing and evading the state purchasing rules and regulations.

76.     Ms. Birckbichler further mislead the trustees on CPP projections, which was a part of Dr. Mohammadi's whistleblower complaints to the Council of Trustees and Chancellor as well as to the auditing firm of Clifton, Larson and Allan along with Engineering's false enrollment projections; the amount of compensation to this public relations firm exceeded $100,000 in FY 22 and FY 23, which was in violation of state rules.

77.     By 2021, the deficit in the engineering programs grew to approximately $1 million, although that amount did not comprise the all-inclusive costs, including equipment, facilities, and scholarships, and overhead including direct and indirect costs.

78.     Periodically the Council of Trustees would request a report on the status of the engineering program including in connection with the original budget projection; both Dr. Behre and the former CFO, and the new CFO would not disclose the adverse economic consequences to the University, and would purposely mislead them in regard to the financial status of the program.

79.     Dr. Zink joined Dr. Mohammadi in expressing her concern about not having engineering labs ready for senior engineering students in Fall 2022.

80.     Dr. Mohammadi had expressed concerns that the engineering labs were not constructed by mid-October 2021, that some of the equipment either had not arrived or was not hooked up due to inferior design.

81.     Apparently aware of the inadequacies of the engineering program, Dr. Behre requested that Dr. Mohammadi work with Dr. Zink to initiate negotiations with Grove City College, a private institution almost eight miles away from the SRU campus, so that SRU engineering

students would have access to Grove City's engineering laboratories.

82.     Dr. Mohammadi had complained on numerous times about co-mingling funds between the SRU Foundation and the state funds and auxiliary funds.

83.     Grove City College describes itself as a "conservative Christian" institution, and Dr. Mohammadi balked at SRU, a secular public agency, opening negotiations with that institution and/or paying it with public funds.

84.     Neither Dr. Mohammadi nor Dr. Zink was tasked with determining if there were other facilities, and/or whether there could be competitive bidding of public money for off-site services.

85.     Dr. Behre's proposal was not compatible with higher education accreditation and undercut the mission of having a first-class program dedicated wholly to SRU students.

86.     In the wake of Dr. Mohammadi's resistance to the dangerous and prohibitively expensive Engineering School proposal, Dr. Behre sought greater influence and to minimize Dr. Mohammadi's voice through expanding the cabinet from six to eleven members while giving overall salary raises in excess of a million dollars to those whose job duties and responsibilities had not changed, except that they now reported directly to Dr. Behre; this included changing Foundation employees payroll to University payroll.

87.     Later, when the students did not have their labs opened on time, Dr. Behre falsely blamed Dr. Mohammadi.

88.     Dr. Zink and Dr. Mohammadi requested an expedited plan of what was needed for the senior engineering students not to have the same inadequate experience as they had in their junior year in Fall 2021.

89.     Dr. Mohammadi wrote to the Council of Trustees and the Chancellor indicating that

Dr. Behre was retaliating against Dr. Zink and requested an investigation.

90.     As a follow-up to his February 2022 Memorandum, Dr. Mohammadi provided documents necessary to perform an initial investigation.

91.     Shortly thereafter Dr. Zink was terminated.

92.     Dr. Mohammadi was then terminated and the results of the investigation (if any) never were revealed.

93.     In a letter, Dr. Mohammadi requested that SRU hire an independent consultant auditor to investigate the University's finances as well as the overall budget, including inaccurate engineering budget projections that led the Council of Trustees and Board of Governors to grant approval.

94.     In reaction to Dr. Mohammadi's letter Chancellor Greenstein ordered a forensic audit of SRU's finances.

95.     No one from the outside auditing firm, Clifford Larsen Allen (CLA), charged with conducting the forensic audit contacted Dr. Mohammadi after an initial brief discussion, which was very odd given his superior historical knowledge of finances and apparent ability to help advance the thoroughness of investigation.

96.     CLA already was a contractor to PASSHE; there was no competitive bidding for this contract.

97.     Dr. Mohammadi had informed the Council of Trustees and the Chancellor of some potential embarrassment and irregularities that were matters of public concern including to students, potential students, state government, the education market, and taxpayers.

98.     At that time Dr. Mohammadi did not want to go public with his concerns given his

loyalty and service to SRU and PASSHE.

99.     Dr. Mohammadi submitted a memorandum to the Council of Trustees entitled "Manage the issues prior to managing the crisis."

100.    After his internal whistleblower memorandum and his termination, Dr. Mohammadi raised his concerns to the press.

101.    On April 20, 2022, Chancellor Greenstein announced that the audit did not reveal any financial improprieties but strangely refused to disclose the findings despite efforts by the Counsel of Trustees including in their June 2022 meeting that they unanimously voted for the Board of Governors to direct the Chancellor to do so.

102.    Even with an official vote of the University Trustees, the Chancellor still refused to do so.

103.    That very day (April 20, 2022) the University announced that it was eliminating Dr. Mohammadi's position, thereby leading to his termination.

104.    Dr. Mohammadi had no prior indication that his position was in jeopardy; in fact, a few months earlier, his performance significantly exceeded expectations and he received the highest raise among his peers.

105.    Only one other senior SRU administrator, Dr. Zink, was terminated due to apparent retaliation.

106.    Dr. Zink also had raised concerns regarding the reliability of SRU's published financial data.

107.    Others not Iranian and/or Muslim who previously had brought complaints against SRU or raised concerns regarding SRU finance, did not have their positions eliminated and given

to a less qualified individual, including one who had competed earlier for a job that the Complainant had won.

108.    The elimination of Dr. Mohammadi's position and his subsequent termination both constitute adverse employment actions and served to cover up financial improprieties and future budget deficits.

109.    The aforementioned adverse actions also were precipitated by Dr. Mohammadi's national origin, race, and religion.

110.    Dr. Mohammadi demands a jury trial.

## VI.  COUNTS

### COUNT I: DISCRIMINATION ON THE BASIS OF RACE/NATIONAL ORIGIN
### Violation of 42 U.S.C. § 1981 through 42 U.S.C. § 1983
### Plaintiff Amir Mohammadi v. All Defendants

111.    The preceding paragraphs are incorporated as if set forth at length herein.

112.    42 U.S.C. § 1981 ensures the equal right of all individuals to make and enforce contracts regardless of race.

113.    Plaintiff brings this Section 1981 claim through 42 U.S.C. § 1983.

114.    Defendants acted under the color of state law and in their personal capacities.

115.    Dr. Mohammadi is of Iranian national origin and, as such, is a member of a class protected by Section 1981.

116.    Dr. Mohammadi was qualified for his position at SRU.

117.    Dr. Mohammadi was subjected to an adverse employment action when Defendants failed to implement the terms and conditions of the underlying previous court settlement agreement.

118.    Dr. Mohammadi was subjected to an adverse employment action when his position

at SRU was eliminated, even though he had an outstanding annual performance review, along with the highest possible raise.

119.    Similarly situated individuals who were not of Iranian national origin were not subjected to similar adverse action and no other positions were reviewed for possible elimination despite budget deficits.

120.    Dr. Mohammadi was subjected to the aforementioned adverse employment actions on account of his race/national origin.

121.    Dr. Mohammadi seeks all remedies and damages permitted under 42 U.S.C. § 1981 through 42 U.S.C. § 1983, including, but not limited to, back pay, front pay, emotional distress, medical harm, reputation harm damages, reinstatement, attorney's fees, costs, and pre-judgment and post-judgment interest.

**COUNT II: RETALIATION**
**Violation of 42 U.S.C. § 1981 through 42 U.S.C. § 1983**
**Plaintiff Amir Mohammadi v. All Defendants**

122.    The preceding paragraphs are incorporated as if set forth at length herein.

123.    42 U.S.C. § 1981 ensures the equal right of all individuals to make and enforce contracts regardless of race.

124.    Plaintiff brings this Section 1981 claim through 42 U.S.C. § 1983.

125.    Defendants acted under the color of state law.

126.    Dr. Mohammadi is a Muslim of Iranian national origin and, as such, is a member of a class protected by Section 1981.

127.    Dr. Mohammadi was qualified for his position at SRU.

128.    Dr. Mohammadi filed a prior federal civil rights complaint regarding racial/national

17

origin discrimination against SRU; this was later settled in court, but the terms were violated by named defendants, PASSHE and SRU.

129.    The filing, pursuit and settlement of the aforementioned complaint constitute action protected by Section 1981.

130.    Dr. Mohammadi was subjected to an adverse employment action when Defendants failed to implement the terms and conditions of the underlying court settlement agreement.

131.    Dr. Mohammadi was subjected to an adverse employment action when his position at SRU was eliminated and his position was given to a less qualified individual.

132.    Similarly situated individuals who did not make complaints of discrimination were not subjected to similar adverse action.

133.    Dr. Mohammadi was subjected to the aforementioned adverse employment actions because he had engaged in the aforementioned protected activity.

134.    Dr. Mohammadi seeks all remedies and damages permitted under 42 U.S.C. § 1981 through 42 U.S.C. § 1983, including, but not limited to, back pay, front pay, emotional distress, medical harm, reputation harm damages, reinstatement, attorney's fees, costs, and pre-judgment and post-judgment interest.

### COUNT III: RETALIATION FOR EXERCISE OF FREE SPEECH
### Violation of 42 U.S.C. § 1983 et seq.
### Plaintiff Amir Mohammadi v. All Defendants

135.    The preceding paragraphs are incorporated as if set forth at length herein.

136.    Dr. Behre and Chancellor Greenstein are state actors who acted under the color of law to deny Dr. Mohammadi his protected rights to free speech.

137.    At all relevant times Dr. Behre and Chancellor Greenstein acted under color of state

law, inasmuch as their acting as set forth at length above constitutes misuse of power possessed solely by virtue of state law and made possible only because Dr. Behre and Chancellor Greenstein are and were clothed with the authority of state law.

138.    Speech related to the financial condition of public universities is protected by the First Amendment.

139.    Dr. Mohammadi engaged in protected speech when he complained of financial irregularities at SRU, both internally and, after his termination, to the press.

140.    Dr. Mohammadi's motivation with respect to his disclosures was to raise awareness of financial improprieties at SRU in order to save SRU from future damages and embarrassment, service students, and save taxpayers further financial waste.

141.    Dr. Mohammadi raised alarms to Dr. Behre, the Council of Trustees, and Chancellor Greenstein, who did nothing to oppose Dr. Mohammadi's termination.

142.    Because of this refusal to deal with this in-house and ethically, Dr. Mohammadi's fiscal responsibility and integrity demanded that he raise public awareness.

143.    Dr. Mohammadi's job duties do not concern the public reporting of financial issues at SRU or at any other state university.

144.    The financial health of public institutions of higher education is a matter of public concern.

145.    Dr. Mohammadi's disclosures were protected by the First Amendment.

146.    Shortly after Dr. Mohammadi made his protected speech he was subjected to adverse action in the form of the elimination of his position.

147.    Similarly situated individuals who did not engage in the public disclosures were not

subjected to similar adverse action.

148.    Dr. Mohammadi was subjected to adverse action because he engaged in protected speech.

149.    Dr. Mohammadi seeks all remedies and damages permitted under 42 U.S.C. § 1983, including, but not limited to, back pay, front pay, emotional distress, medical harm, reputation harm damages, reinstatement, attorney's fees, costs, and pre-judgment and post-judgment interest.

### COUNT IV: DENIAL OF SUBSTANTIVE DUE PROCESS/RELIGIOUS DISCRIMINATION
### Violation of 42 U.S.C. § 1983
### Plaintiff Amir Mohammadi v. All Defendants

150.    The preceding paragraphs are incorporated as if set forth at length herein.

151.    Dr. Behre and Chancellor Greenstein are state actors who acted under the color of law to deny Dr. Mohammadi his protected rights to free speech.

152.    At all relevant times Dr. Behre and Chancellor Greenstein acted under color of state law, inasmuch as their acting as set forth at length above constitutes misuse of power possessed solely by virtue of state law and made possible only because Dr. Behre and Chancellor Greenstein are and were clothed with the authority of state law.

153.    Freedom of religion is a constitutionally-protected interest.

154.    Dr. Mohammadi is a Muslim and has the constitutionally-protected right to practice Islam.

155.    Dr. Mohammadi was qualified for his position at SRU.

156.    Dr. Mohammadi was subjected to an adverse employment action when Defendants failed to implement the terms and conditions of the underlying settlement agreement.

157.    Dr. Mohammadi also questioned Dr. Behre's request that he negotiate with Grove City College.

158.    Dr. Mohammadi was subjected to adverse employment action when his position at SRU was eliminated.

159.    Dr. Behre and/or Chancellor Greenstein interfered with Dr. Mohammadi's protected rights to freedom of religion when they subjected him to the aforementioned adverse employment actions.

160.    Dr. Behre and/or Chancellor Greenstein did not subject any SRU or PASSHE employee who did not practice Islam to similar adverse treatment.

161.    Dr. Mohammadi was subjected to adverse treatment because of his religious practices.

162.    Dr. Mohammadi seeks all remedies and damages permitted under 42 U.S.C. § 1983, including, but not limited to, back pay, front pay, emotional distress, medical harm, reputation harm damages, reinstatement, attorney's fees, costs, and pre-judgment and post-judgment interest.

Respectfully Submitted,

LIEBER HAMMER HUBER & PAUL, P.C.

s/James B. Lieber
James B. Lieber
Pa. I.D. No. 21748
Thomas M. Huber
Pa. I.D. No. 83053
Jacob M. Simon
Pa. I.D. No. 202610
1722 Murray Avenue, 2nd Floor
Pittsburgh, PA 15217
(412) 687-2231 (telephone)
(412) 687-3140 (fax)